KAMALA D. HARRIS
Attorney General of California
KEVIN VIENNA
Supervising Deputy Attorney General
ROBIN URBANSKI
Deputy Attorney General
State Bar No. 228485
 110 West A Street, Suite 1100
 San Diego, CA 92101
 P.O. Box 85266
 San Diego, CA 92186-5266
 Telephone: (619) 645-2230
 Fax: (619) 645-2271
 E-mail: Robin.Urbanski@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **MARVIN VERNIS SMITH,**<br><br>                              Petitioner,<br><br>    v.<br><br>**RAUL LOPEZ, WARDEN,**<br><br>                              Respondent. | SA CV 11-1076 ODW (MRW)<br><br>**OPPOSITION TO PETITIONER'S MOTION FOR RELEASE PENDING APPEAL**<br><br><br>Judge:       Hon. Michael R. Wilner |

Respondent submits this Opposition to Petitioner's motion for release on his own recognizance, with or without surety, pending resolution of the state's appeal from this Court's granting of the writ of habeas corpus. After concluding that Petitioner Marvin Smith lacked notice that he could be prosecuted for first degree murder under an aiding-and-abetting theory, this Court's Judgment conditionally granted Smith habeas corpus relief under 28 U.S.C. § 2254 unless the state decided to retry him within 90 days of the Judgment becoming final. Respondent filed his Notice of Appeal as well a Motion to Stay the order granting the writ on May 9,

///

1

2012. The following day, District Judge Otis D. Wright II, amended the judgment and delayed issuance of the writ until the conclusion of the appellate proceedings.

Federal Rules of Appellate Procedure Rule 23(c) governs the decision on whether to release a state prisoner from custody pending appeal. The rule provides:

> While a decision ordering the release of a prisoner is under review, the prisoner must — unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise — be released on personal recognizance, with or without surety.

Contrary to the general presumption, however, the United States Supreme Court "has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court." *Hilton v. Braunskill*, 481 U.S. 770, 775, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987), citing *Rogers v. Richmond,* 365 U.S. 534, 549 (1961); *Dowd v. United States ex rel. Cook*, 340 U.S. 206, 210 (1951); *In re Bonner*, 151 U.S. 242, 261-262 (1894)[1]. In determining whether to grant enlargement on bail or on own recognizance to a successful habeas petitioner, federal courts generally look to traditional factors such as the likelihood of state's success on the merits of the appeal, the state's interest in continuing custody and rehabilitation, the risk that the petitioner would pose a danger to the public if released, the risk of flight, the length of the remaining sentence, and the interest of the habeas petitioner in release pending appeal. *Hilton*, 481 U.S. at 777-78; *Landano v. Rafferty*, 970 F.2d 1230, 1238 (3d Cir. 1992). The application of these factors renders release in this case wholly inappropriate.

---

[1] Notably, in 1894 the Federal Rule in place *required* release of a successful habeas petitioner pending the government's appeal, but the high Court nonetheless recognized that federal courts are vested " 'with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus.'" *Hilton*, 481 U.S. at 775 (referring to former Rule 34, and quoting *In re Bonner*, 151 U.S. at 261).

2

**A. The State's Likelihood of Success**

"Where the State establishes that it has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits, continued custody is permissible if the second and fourth factors in the traditional stay analysis [whether the state will be irreparably injured and the public's interest in continued confinement] militate against release." *Hilton,* 481 U.S. at 778.  Here, there is a strong likelihood, or at the very least a substantial case, that Respondent will prevail on appeal.

The state is likely to succeed on appeal because this Court granted relief without identifying any clearly established United States Supreme Court authority requiring that a prosecutor notify a criminal defendant of his particular theory of murder.  Similarly, this Court's ruling, requiring that a prosecutor notify a defendant of his intent to proceed on a vicarious liability theory, is a new rule of criminal procedural not compelled by the Constitution or Supreme Court precedent and is barred by *Teague v. Lane,* 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).  Finally, given the compelling evidence pointing to Smith as his wife's murderer, and not an aider and abettor to her murder, this Court's finding that any lack of notice as to the aiding-and-abetting theory had a substantial and injurious effect on the verdict is not supported by the record.

The state court's rejection of Smith's due process claim that he lacked notice of the aiding-and-abetting theory of liability was reasonable as the information, charging Smith with first degree murder, provided all the notice that was constitutionally required.  The United States Supreme Court precedent controlling Smith's claim is as follows: "No principle of procedural due process is more clearly established than that notice of the *specific charge*, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 644 (1968) (emphasis added).

The Ninth Circuit has recognized, "[A] charging document, such as an information, is the means by which [Sixth Amendment] notice is provided." *Gautt v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007); *see also James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) ("To determine whether a defendant has received fair notice of the charges against him, the court looks first to the information.")  There is no controlling Supreme Court precedent for the proposition that the prosecution must notify the defense of the *specific theories* of the charge indentified in the information on which it intends to proceed at trial.

Here, the state court properly applied controlling United States Supreme Court precedent in determining that the information provided Smith with sufficient notice that he would need to be prepared to defend against the charge of first degree murder and all of the theories encompassed by that charge, including vicarious liability.  Moreover, the state court properly concluded that even if additional notice were required, Smith received that notice by virtue of the evidence presented at the preliminary hearing, which suggested that although Smith may not have directly killed his wife, he planned the crime and staged the crime scene to appear as though his wife had been the victim of a home invasion robbery.

This Court's order granting the petition identifies no controlling United States Supreme Court Authority requiring notice of a *theory* of prosecution. Rather, it extends the general notice principle of *Cole* to impose a new rule on prosecutors.  But, the Supreme Court has "made clear that the absence of controlling Supreme Court precedent effectively insulates a state court decision from federal review under AEDPA, *Wright v. Van Patten*, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) (per curiam) ('Because our cases give no clear answer to the question presented, let alone one in [the accused's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.')" *Sessoms v. Runnels*, __F.3d__, 2011 WL 2163970 at *16, n. 6 (9th Cir. June 11, 2011). "Simply put, one cannot demonstrate that a decision is "contrary to, or an

unreasonable application of," precedent that does not yet exist." *Sessoms v. Runnels*, 2011 WL 2163970 at *6.

Additionally, this Court's order granting the writ does not consider the prosecutor's actual theory of the case — that Smith alone murdered his wife – and the overwhelming evidence that supported that theory such that any deficiency in the notice of an aid-and-abetting theory of liability could not have had a substantial and injurious effect on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 629-30, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)

In sum, in the absence of any controlling authority from the United States Supreme Court holding that a prosecutor is constitutionally required to notify a criminal defendant that he intends to proceed on particular theory of a crime charged in an information, it cannot be said that the state court's rejection of Smith's claim was an error so obvious and indisputable, that it cannot even be the subject of fairminded disagreement. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011). As such, the state has a strong likelihood, or at least a substantial case, of success on appeal.

**B. The State's Interest in Smith's Continued Confinement**

The State of California has a significant and compelling interest in Smith's continued custody. His guilt in this case of first degree murder was supported by ample evidence and even if the State does not prevail on appeal, his probability of conviction on retrial is high.

Smith's wife, Minnie Smith, was bludgeoned to death by a fireplace tool in her own home; the crime scene was made to look like a home invasion robbery. The crime scene was an atypical crime scene for a home invasion, however. Although a vase had been knocked over below the kitchen window as though the "burglar" had entered through that window, there was no shoe print in the planter below the window on the outside of the house and no dirt on the window sill or interior floor. (3 RT 669; 5 RT 1019-1020.) The only property stolen from the

5

home was taken from a floor safe concealed in the master bedroom closet and hidden beneath the carpet — a safe that Smith himself admitted no one would suspect was there unless he knew about it. (5 CT 1307-1308; 10 RT 1885-1886, 1902-1903.)  Moreover, the "burglar" had not ransacked the closet or the house in general to look for valuables (5 RT 1021-1022 ); strangely, the laundry room had been ransacked (10 RT 1885, 1890).  A loaded gun (5 RT 799-800), and the victim's purse (5 RT 1050), were not taken.  The murder weapon (the fireplace tool), the wire hanger binding the victim's wrists, and the duct tape found near her body, were all household items and not items an intruder would have brought into the home. (3 RT 676-677, 680; 4 RT 848-850, 916-917.)   The burn injuries on the victim's body and the lack of injury to her wrists where she was bound signified that the injuries occurred at, or after, the time of her death (4 RT 908-910); it would be highly unusual for a true home invader to remain at the crime scene long enough to do such things to the victim's body.  When Smith walked through the crime scene with a detective, he volunteered that jewelry and $30,000 should have been in the floor safe. (5 RT 1052-1054.)  The "stolen" jewelry was found in the trunk of his car as was a roll of duct tape. (5 RT 1058-1062; 6 RT 1209.)   Smith had cavorted with other women, and even established joint bank accounts with another woman, for years prior to his wife's murder. (7 RT 1395-1398, 1407-1420; 8 RT 1472-1473, 1475-1476, 1652-1653.)  Additionally, Smith said that "the only way to get out of the marriage they had to die," and that he was "not going to give [Minnie] half of what [he] got so another man can live off it." (9 RT 1804.) Smith's DNA, and no other suspect's DNA, was found in the master bedroom, on the duct tape near the victim's body, on the duct tape around the jewelry box, and on the fireplace tool. (8 RT 1583-1587-1589, 1596-1597, 1599, 1614-1615.) Although the jury heard that Smith was still recovering from shoulder surgery, the jury also heard that he was healing very well and his range of motion was better than would generally be expected. (14 RT 2723-2725.)  Additionally, there was no

reason why Smith could not use his good arm, or even both arms, to wield the fireplace tool and murder his wife. (14 RT 2823.)

    As the Supreme Court has observed:

> [A] successful habeas petitioner is in a considerably less favorable position than a pretrial arrestee . . . to challenge his continued detention pending appeal. Unlike a pretrial arrestee, a state habeas petitioner has been adjudged guilty beyond a reasonable doubt by a judge or jury, and this adjudication of guilt has been upheld by the appellate courts of the State. Although the decision of a district court granting habeas relief will have held that the judgment of conviction is constitutionally infirm, that determination itself may be overturned on appeal before the State must retry the petitioner.

*Hilton*, 481 U.S. at 779.

    Here, this Court determined that Smith lacked notice of an aiding-and-abetting theory and therefore his conviction was constitutionally infirm. At a retrial, given these proceedings, he would have the requisite notice. Under these circumstances, where Smith's chances of acquittal on retrial are low, the public interest would be served and Smith would not be unduly harmed by continued confinement. To be sure, the state has a significant interest in fully punishing Smith for his brutal crime. The public has an interest in being protected from criminals who have been convicted, like Smith, of murder. That interest favors maintaining Smith's custodial status while the state pursues its rights in the Ninth Circuit Court of Appeals.

**C.  Smith Presents a Flight Risk and a Danger to the Community**

    Smith's attempt to show he is non-violent and not a flight risk is unpersuasive. His entire motion for release is based upon his being 75 years old and having been diagnosed with various health problems, including colon cancer. (Exhibit 1 to Petitioner's Motion for Release ("Pet. Exh. 1".)  The fact that Smith is

75 should have no bearing on this Court's decision – he murdered his wife when he was 69 years old. A jury found that Smith did so, beyond a reasonable doubt, at his trial when Smith was 71 years old. (4 CT 1195.) The medical memoranda he offers in support of his declining health were prepared in 2008, just three years after he murdered his wife. (Pet. Exh. 1.) Even this Court's Report and Recommendation granting the writ noted that Smith "may well have killed his wife." (R & R at 27.) He was able to do so despite his age and health.

Further, murdering his wife was not Smith's only violent act. The jury at his trial heard that on August 18, 1991, Annis Cravin was Minnie's and Smith's next door neighbor in Inglewood. (9 RT 1697.) That day, she heard Minnie arrive home, slam the door, and heard Smith arrive home a few minutes later. Then, she heard yelling coming from the house followed by Minnie screaming. (9 RT 1698-1700.) Cravin heard "rumbling" followed by what she thought was a gunshot. She called 911. (9 RT 1700.) A short while later, Cravin saw police officers bring Smith out of the house in handcuffs. The paramedics arrived; Minnie was bleeding profusely from the head. (9 RT 1701.) The next day, Cravin saw Minnie and observed that she had stitches. (9 RT 1702-1703.) Smith was home the next day as well. (9 RT 1708.) Bennie Thomas, Minnie's son and Smith's stepson, was contacted by his cousin to go to his mother's house that day. When he arrived, he saw that Minnie had a black eye with a gash above it. (8 RT 1665-1667.)

Moreover, Smith's daughter's declaration attached to the instant motion stating that she had located an apartment in an unnamed location does not inspire confidence that Smith would remain in the jurisdiction if released. (Declaration of Brenda Smith, M.D., attached to Petitioner's Motion for Release.) The notion that "he is close to his entire family, which is extremely important to him" in no way refutes the reality that there is nothing preventing him from leaving the jurisdiction if released. (Declaration of Brenda Smith, M.D.) Despite his age and health conditions, Smith remains a flight risk who is unsuitable for bail.

### D. Smith's Remaining Sentence is Lengthy

Smith's sentence is nowhere near completion. He was sentenced to a term of 25 years to life on March 21, 2008, and thus his remaining term is lengthy. (4 CT 1195; 16 RT 3169.) The state's interest in continuing custody and rehabilitation is "strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served." *Hilton*, 481 U.S. at 777.

### E. Smith's Interest in Release

Not surprisingly, Smith wishes to be released while the state pursues an appeal in the Ninth Circuit Court of Appeals. He has not provided this Court with a compelling reason to do so. While he asserts that he is 75 years old, has undergone an operation related to colon cancer, has received chemotherapy, suffers from hearing loss, and is "of tenuous health" (Motion at 2), nowhere does Smith assert that he has not been receiving appropriate medical treatment in state prison. Despite his conclusory statement that "his life expectancy is short" (Motion at 11), Smith has offered no medical record, doctor's declaration, or any other reasonably available evidence to support that allegation. Nowhere has Smith presented information that his health condition is dire or untreatable. Nowhere has Smith asserted that he must be released to a medical treatment facility to receive proper care. In fact, contrary to his claim, Smith has offered medical reports from three and a half years ago indicating he underwent surgery and received treatment for his medical condition while in custody. (Pet. Exh. 1.) He has not offered any more recent medical information to show that his condition or care has deteriorated.

Balancing Smith's desire to be released to be with his family and the state's interest in keeping a convicted murderer in custody must tip the scale in favor of the state. Balancing Smith's desire to be released to be with his family and the state's likelihood of success on appeal or retrial must tip the scale in favor of the state.

///

Finally, balancing Smith's desire for release with the danger he presents to the community and of fleeing the jurisdiction must tip the scale in favor of the state.

## CONCLUSION

For the foregoing reasons, this Court should deny Smith's request for release on his own recognizance, with or without surety, pending appeal.

Dated: June 8, 2012

Respectfully submitted,

KAMALA D. HARRIS
Attorney General
KEVIN VIENNA
Supervising Deputy Attorney General

/S/ ROBIN URBANSKI

ROBIN URBANSKI
Deputy Attorney General
*Attorneys for Respondent*

SD2011701683
70581682.doc

10

# CERTIFICATE OF SERVICE

Case Name:  **Smith v. Lopez**          No.  **SA CV 11-1076 ODW (MRW)**

I hereby certify that on June 8, 2012, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO PETITIONER'S MOTION FOR RELEASE PENDING APPEAL**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 8, 2012, at San Diego, California.

|                J. Yost                |          /S/ J. Yost          |
|---------------------------------------|-------------------------------|
|               Declarant               |           Signature           |

70581752.doc